Filed 2/27/13  In re A.C. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.C., A Person Coming Under the Juvenile Court Law. | B242615 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.D.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK92049) |

APPEAL from orders of the Superior Court of Los Angeles County. Steven Klaif, Juvenile Court Referee.  . Affirmed

Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother A.D. appeals from the juvenile court orders taking jurisdiction of her son, A.C., and removing the child from her custody. She contends there was insufficient evidence to support those orders, and that the juvenile court erred by admitting certain hearsay evidence. We disagree with her contentions and affirm those orders.

## FACTS AND PROCEDURAL HISTORY[1]

A.    *The February 24, 2012 Marina Del Rey Incident*

S.C. (father) and A.D. (mother) are the parents of A.C., and in February 2012 all three lived together on father's boat in Marina Del Rey. On February 24, 2012, father brought the 10-month-old boy to a Sherman Oaks hospital because the child's hands had been severely scalded the day before. When a doctor recommended transferring the child to a burn center, the father said he would take the child there himself. The hospital called the police, who stopped the father soon after. The police saw that A.C.'s hands were red, blistered, and very swollen, and the child was taken to the West Hills Burn Center.

Father blamed the incident on a babysitter who he claimed was bathing A.C. and failed to notice that the child was turning on the hot water. The police contacted the woman father identified as the babysitter. Although she knew father, she had never met the child and denied any involvement in the incident. Mother later contacted the police and admitted that the burns happened while she was bathing A.C. According to mother, A.C. turned on the hot water, which then splashed on his hands. Mother said she applied burn ointment and bandaged the child's hands, and did not believe the injuries called for immediate medical attention. However, medical records and photographs showed multiple second degree burns and a line around the child's wrist (a burn sleeve) that both a physician and a police officer investigating the case believed suggested the burns were caused by immersing A.C.'s hands in hot water, something that would not occur unless someone held his hands under water. Father then confessed that he had lied because child

---

[1]    As is the usual case with such appeals, the record is quite lengthy. We have distilled the facts in order to fit the issues on appeal.

protective services in Tulare County had already become involved with the family arising from a recent incident that took place when they were living in Porterville.

*B.*     *The January 14, 2012 Porterville Incident*

On January 14, 2012, Porterville police officers went to mother's home in response to a welfare check request by mother's mother (maternal grandmother). The maternal grandmother reported that mother had been mixing alcohol and prescription pills. Officers who went to the house reported smelling a strong odor of natural gas. An officer noticed that a knob for one of the cook top burners was on, but no flame was present.

The officer reported that he asked mother if the cook top burner was on. In response, she walked toward the stove, turned the knob, and walked back toward him. Instead of turning the knob off, however, mother turned it up higher. When the officer brought that to mother's attention, she returned to the stove and turned the burner knob to the off position. Mother was stumbling, dragging her feet, and appeared otherwise unsteady. When asked why the burner had been turned on, mother said she had been using the stove to heat the house because the "air conditioner" had been broken for several months.

The officer saw broken glass on the living room floor. Mother said she dropped the glass while taking it down from a rack. The officer saw red fluid on the glass shards and asked mother if she had been drinking from the glass. Mother then changed her story and said the glass fell and broke as she poured wine into it. However, the officer did not see any wine spilled on the counter or the carpet.

According to the officer's report, mother kept walking back and forth through the broken glass, even after he asked her to stop doing so, as if she had not heard what he had said. Mother's speech was slurred, her eyes were red and watery, and her breath smelled like alcohol. When asked whether she had taken any prescription medications, mother said she had taken her prescribed amount of Xanax earlier that afternoon. When asked if she had been drinking, mother said she had some wine after taking her Xanax.

3

Another officer found A.C. in his bedroom. Mother and A.C. were led out of the house and the front door was left open to allow the gas fumes to vent. The fire department was called, but due to a communications error did not arrive for 30 minutes. By the time they arrived, the firefighters could still smell the gas odor, but could not detect any with their sensor gear. The police reported that mother continued to speak with a heavy slur and to stumble about during this period. She was taken into custody and a blood alcohol level test taken two hours after the police arrived showed a level of 0.08. The reporting officer believed that mother's intoxication led her to turn the burner on without making sure that a flame had ignited, placing herself and A.C. at risk of serious harm.

Mother was arrested for child endangerment, but was never charged in connection with this incident and was released from jail after five days. She then met with Tulare County child protective services authorities, and admitted she should not have taken a Xanax that day. The Tulare County child protection officials said they would retain custody of A.C. unless mother agreed to a safety plan that gave father sole custody of the child and required that father not leave the child alone with her. Mother signed the plan, but said she did so under duress.

## C.    *Petition and Hearing in Juvenile Court*

The Los Angeles County Department of Children and Family Services (DCFS) filed a petition with the juvenile court asking that it assume jurisdiction of A.C. due to father's and mother's conduct. (Welf. & Inst. Code, § 300, subd. (b).)[2] Father eventually did not contest the allegations and jurisdiction was assumed based on father's conduct. The allegations against mother were based on the January 2012 natural gas incident, the February 2012 scalding incident, and mother's alleged history of drug and alcohol abuse.

Evidence admitted at the jurisdictional hearing included statements in DCFS reports made by maternal grandmother and her husband that mother was a longtime

---

[2]    All further undesignated section references are to the Welfare and Institutions Code.

4

abuser of drugs and alcohol and had several automobile accidents while inebriated, including one when A.C. was in the car.  They said father used methamphetamine, had stolen from them, and was sometimes violent and threatening.  Father's ex-wife was interviewed and told DCFS that father had a problem with alcohol and drugs and that mother was an alcoholic.

Mother claimed she and maternal grandmother had a poor relationship, that maternal grandmother had sued her, and that maternal grandmother made repeated false reports that mother and father were endangering A.C.  A social worker reported mother's statement that she had taken one Xanax and consumed a half glass of wine on the day of the January 2012 natural gas incident.  Mother contended that she had been cooking chicken and that the oven, not the cook top, had been turned on.  Mother said that she and father moved from Porterville to Los Angeles because they were the victims of a witch hunt.

As for the February 2012 incident where A.C.'s hands were scalded by hot water, mother said she was bathing the child in the kitchen sink of father's boat.  As A.C. sat in the sink, she held him in place with one hand and used the other to reach for and turn off the water pump.  In that instant, A.C. turned on the hot water faucet and put his hand under the ensuing spray of hot water.  A foster family agency case worker named Cates reported a conversation with mother where mother said the scalding incident occurred because she forgot to turn off the water heater.  A.C. turned the faucet on and submerged his right hand, causing the sleeve burn on his wrist, and also had hot water splash on his left hand.  She did not take A.C. to the doctor because his hands were merely a little red.  Following medical advice she read on-line, mother applied burn ointment and bandaged A.C.'s hands.  When they appeared worse the next day, father took the child to the hospital.

Los Angeles police detective Luke said the scalded areas contained "sleeve burns," a visible line at the end of the burn area that indicated submersion.  If the child had accidentally submerged his hand in hot water, he would have quickly pulled it out, the detective said.  Photographs taken of A.C.'s arms and hands right after the incident

5

confirm the presence of these sleeve burns, and also show that major portions of the child's hands and lower wrists were covered with red and blistered areas. A Los Angeles sheriff's detective who investigated the scalding incident said mother willingly took and passed a polygraph exam. An emergency room doctor who saw A.C. said only 40 percent of the hand had been burned, perhaps indicating partial instead of total immersion of the hand.[3] The detective closed the case because there was insufficient evidence of a crime, but she thought mother was "really 'woo-hoo' out there" and was addicted to her medication. A doctor at the Grossman Burn Center who reviewed the photographs and A.C.'s medical records opined that the asymmetrical burn patterns were consistent with splash burns, not immersion burns.

Mother testified at the jurisdictional hearing and denied the statements and conduct attributed to her by various police officers and social workers. According to mother, when the police arrived at her Porterville home on January 14, 2012, she refused to let them in without a warrant. At that point, the officers laughed, said they smelled gas, and pushed their way into the house. According to mother, her range had an electric oven with a gas cook top. She was cooking a chicken in the electric oven at the time, and the gas cook top was not on. She denied ever telling the police that she had turned on the gas burners in order to heat the home. She never smelled natural gas in the home that night. She admitted to having two glasses of wine that afternoon, but denied having taken any Xanax or having told the officers that she had. Instead, she told them that she had filled her Xanax prescription that day but did not take any. The firefighters who arrived later were angry with the police for calling them out there for no reason, she claimed.

When the police took A.C. away that night, she said they were violating her rights. In response, they handcuffed her and took her to a hospital for blood tests. Those tests showed a blood alcohol level of 0.08, but did not show the presence of any drugs. When

---

**3**      The report states that 4 percent of A.C.'s hands had been burned, but we view that as a typographical error based on the photos, which depict burns and blisters covering a significant portion of the child's hands and wrists.

she was released from jail five days later, she signed the safety plan presented by Tulare County child protective services under duress. She understood that the agreement required her to take part in parenting classes and drug and alcohol rehabilitation counseling. She did not do so because she and father moved with A.C. to father's boat in Marina Del Rey. They did so in part because they had been robbed, and in part because the police were coming to their house daily. Those police visits were instigated by maternal grandmother.

Mother admitted to a conviction for drunken driving in 2000, which required her to attend meetings of Alcoholics Anonymous (AA). Even though the police report from that incident stated that mother had driven off the road and crashed into a tree, she denied that account of what happened. Instead, rain caused her car to hydroplane, sending it into a median where it became stuck in the mud. Mother could not recall much about her AA meetings other than watching movies about car accidents and doing group therapy. She denied that she was ever told by AA that she should never again drink alcohol.

Mother repeated her claim that A.C. scalded his hands in the bathtub by turning on the hot water faucet himself. She was not drinking alcohol or taking Xanax at the time. She had been taking drug and alcohol tests for DCFS and always tested negative.

The juvenile court found that mother was "not very credible," especially given her several versions of the various events that conflicted not just with the accounts of police officers and social workers, but with themselves. Although the burns that A.C. received were suspicious, the juvenile court could not say the evidence was strong enough to warrant a finding that they had been intentional. The court also found that mother had an ongoing substance abuse problem. Accordingly, after amending the allegations of the DCFS petition, the court assumed jurisdiction of A.C. under subdivision (b) of section 300 on three grounds: (1) the January 2012 incident where mother's drug and alcohol intoxication caused her to flood the house with natural gas; (2) the February 2012 burns to A.C.'s hands, which the court found had been caused by mother's "unreasonable and neglectful acts"; and (3) mother's recent history of abusing both alcohol and prescription drugs.

The court then ordered A.C. removed from the custody of parents and placed in foster care, with mother and father ordered to receive reunification services.

On appeal, mother contends that there was insufficient evidence that she posed an ongoing risk of harm to A.C. pursuant to any of the three sustained allegations. She also contends that the juvenile court violated her due process rights by admitting in evidence the statements of the maternal grandmother and her husband because those witnesses did not testify at the jurisdictional hearing.[4]

## DISCUSSION

1. *Applicable Law and Standard of Review*

The juvenile court assumed jurisdiction of A.C. after sustaining three allegations under section 300, subdivision (b), which applies when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." This requires proof under the preponderance of the evidence standard. (§ 355, subd. (a).) Jurisdiction may not be assumed based on a single incident. Instead, it must be shown that at the time of the jurisdictional hearing there is sufficient evidence of a substantial risk that the harm will reoccur. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1023.) However, evidence of past

---

**4** DCFS contends that because jurisdiction of A.C. was also assumed due to father's conduct that we should affirm as to mother on the ground that jurisdictional findings as to one parent is good against the other. (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.) As mother points out, however, an outright reversal as to her would allow her to obtain custody of A.C. as a nonoffending parent. (§ 361.2, subds. (a), (b).) Due to this potential adverse consequence, we therefore exercise our discretion to reach the merits of mother's appeal. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

conduct may be probative of current conditions. (*In re James R.* (2009) 176 Cal.App.4th 129, 135-136.)

Once jurisdiction exists, the juvenile court may not take physical custody of the child away from the parent unless it finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from" the parents' custody. (§ 361, subd. (c)(1).)

The standard of appellate review from both the jurisdictional and dispositional orders is substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575, 578.)

2. *There Was Substantial Evidence to Support Both Orders*

Mother is correct that a single instance of harm, standing alone, is not enough to warrant assuming dependency jurisdiction over a child. Instead, there must be some reason beyond mere speculation to warrant a finding that a substantial risk of harm exists at the time of the jurisdictional hearing. (*In re J.N., supra,* 181 Cal.App.4th at p. 1023.) Mother contends there is insufficient evidence that she has a substance abuse problem, and that there is no evidence of a risk that she will repeat either the January natural gas incident or the February scalding incident. We disagree.

We begin with the substance abuse allegation. Mother was convicted of drunken driving in 2000. She denied the statements in the police report that she crashed into a tree, contending instead that rainwater caused her car to skid off the road and become stuck in the mud. She recalled little if anything from the AA program she attended following that conviction. Maternal grandmother reported that mother had a years-long drug and alcohol abuse problem. When the police showed up at mother's Porterville house to check on her welfare in January 2012, they found her highly intoxicated, slurring her speech and stumbling about. She told the police that she had been drinking a small amount of wine and had taken a Xanax. Her blood alcohol level two hours later was .08. She also told DCFS that she had taken a Xanax that day. Later on, however,

9

she denied taking Xanax or telling the police that she had done so, denied ever turning the gas cook top on, and essentially accused the police of fabricating the natural gas incident in order to gain entry to her home. She also claimed to have consumed just two glasses of wine, but her blood alcohol level of 0.08 two hours after the police arrived led a DCFS social worker to conclude that mother had consumed a bottle of wine. A police detective who interviewed mother after the February scalding incident thought mother was "out there" and appeared to be abusing her prescription medication. At a minimum, this evidence permits the inference that mother had a long-term, ongoing substance abuse problem which, instead of admitting and addressing, she continued to deny, minimize, and blame on others.

As for the natural gas and scalding incidents, mother does not deny that they occurred or that they led to actual serious harm or posed a risk of such harm. We do not see the issue as whether there is evidence that those precise incidents will reoccur. Instead, the question is whether mother is so careless and inattentive, whether due to her substance abuse problem or not, that she cannot perform everyday tasks of childcare without putting A.C. at risk of serious harm.

In January 2012, after ingesting both Xanax and what appears to have been a substantial amount of wine, mother turned on a gas burner to heat the house and did not notice that the flame failed to ignite. As a result, A.C. was put at grave risk. Although mother signed a safety plan with Tulare County child protective services that called for her to undergo counseling and not be alone with the child, her response was to move out of the area with father and A.C. Although mother contended she did so at least in part in response to a witch hunt, the juvenile court could infer that she did so to avoid confronting the realities of her situation and the risk she posed to the child.

Little more than a month later, the child's hands were severely scalded while mother bathed him. Although she denied taking drugs or alcohol at that time, the juvenile court was free to disbelieve her testimony, especially given her history of substance abuse and the circumstances surrounding the January natural gas incident. Given mother's continued denial of her substance abuse problems, and her penchant for

10

either denying any wrongdoing or blaming others, we believe the juvenile court could infer that mother continued to pose a risk of inflicting substantial harm upon A.C. at the time of the jurisdictional hearing.

The same evidence supports the juvenile court's dispositional order because the evidence shows that there was a substantial danger to A.C.'s health and safety that could not be prevented without removing him from the home, especially in light of mother's decision to move away rather than comply with the Tulare County safety plan.

3.     *Admission of Maternal Grandparents' Hearsay Statements*

Mother raised a hearsay objection to admitting the statement of maternal grandmother and her husband that were contained in DCFS reports.[5] Those witnesses had been subpoenaed by DCFS and, with the consent of the parties, were allowed to testify by phone. However, the two witnesses did not answer their phone when the court tried to call them. As a result, the court said it would allow the statements in evidence, would not base any findings solely on those statements, and would instead give them the weight they were due.

Mother contends the juvenile court violated her constitutional rights to confront and cross-examine those witnesses. She acknowledges that under section 355, the hearsay evidence was admissible so long as it was not the sole evidentiary basis for a jurisdictional finding or any ultimate fact upon which such a finding was based. (§ 355, subd. (c)(1).) However, she contends that the juvenile court violated subdivision (d) of that section, which granted her the unlimited right to subpoena witnesses whose statements were contained in DCFS reports.[6]

---

[5]     Mother also made hearsay objections to other witness statements contained in DCFS reports, but on appeal challenges only those of maternal grandmother and her husband.

[6]     Frankly, it is hard to discern the precise nature of mother's complaint from her appellate brief. The contention that we summarize in the text is the closest we could

11

To the extent we comprehend this argument, it is not only unsupported by record citations, it is contradicted by the record itself. DCFS subpoenaed the witnesses, and mother does not contend that there was some defect in those subpoenas or that DCFS or the juvenile court somehow interfered with her ability to serve duplicative subpoenas of her own. When the witnesses failed to appear telephonically pursuant to the parties' earlier agreement, the juvenile court complied with section 355 by ruling their statements were admissible, but by determining that those statements would be given only the weight they were due and would not serve as the sole basis for any findings. Nothing in the record shows that the court relied solely on those statements to make any of its findings. We find no error.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed as to mother.


                                        RUBIN, J.
WE CONCUR:


        BIGELOW, P. J.


        GRIMES, J.

---

come to a direct assertion by her. Any other issues she may contend were raised are therefore deemed waived. (*Luckett v. Kaylee* (2007) 147 Cal.App.4th 919, 927, fn. 11.)